**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| SUN LIFE ASSURANCE COMPANY OF CANADA, | Civil Action No.: 14-5789 (PGS)(LHG) |
| *Plaintiff*, | |
| v. | **MEMORANDUM AND ORDER** |
| WELLS FARGO BANK, N.A., as Securities Intermediary, | |
| *Defendant*. | |

**SHERIDAN, U.S.D.J.**

This matter involves an alleged fraudulent stranger-originated life insurance ("STOLI") scheme. Sun Life Assurance Company of Canada ("Sun Life") granted a life insurance policy on the life of an elderly woman (Nancy Bergman); the trust was allegedly funded through stranger investors who intended to sell the trust on the secondary market or collect the benefit upon the Insured's death. After the two-year period to contest the life insurance Policy expired, the investors sold the Policy, and eventually Wells Fargo Bank, N.A. ("Wells Fargo") became the owner of the Policy[1]. Upon the Insured's death, Wells Fargo sought to collect on the Policy; but Sun Life now seeks a declaratory judgment that the Policy is void *ab initio* as violating public policy. Wells Fargo, in turn, requests a declaration of breach of contract, and for the Court to

---

[1] In March 2011, Wells Fargo loaned funds to a company named LTAP and LTAP used the loan proceeds to pay premiums on the Sun Life policy. Wells Fargo has a security interest in the policy. When LTAP went bankrupt, the bankruptcy judge ordered that the policy be transferred to Wells Fargo (see page 6).

direct Sun Life to pay it the proceeds ($5 million) of the Policy. If the Court were to declare the Policy void *ab initio*, Sun Life requests that the Court enter summary judgment dismissing counts II and III of Wells Fargo's Counterclaim seeking a refund ($1,928,726.01) of the premiums it paid or funded through on the Policy.

For the reasons set forth below, the Policy constitutes a STOLI scheme, and under New Jersey law it violates public policy and is void *ab initio*. As a result, Sun Life may challenge the Policy despite the passage of the two-year contestability period, waiver and estoppel does not apply, and it does not have to pay the death benefit to Wells Fargo. However, Sun Life must refund the premiums to Wells Fargo so that Sun Life does not obtain a windfall.

**<u>Facts and Procedural History:</u>**

In late April 2007, Sun Life received an application (the "Application") for a $5 million life insurance policy (the "Policy") on the life of Nancy Bergman ("Mrs. Bergman" or "Insured"). (Defendant's Statement of Undisputed Material Facts ("DSUMF") ¶ 1; Plaintiff's Response to DSUMF ("PRSUMF") ¶ 1). Defendant claims that Mrs. Bergman had been working with an agent, David Kohn ("Kohn") since late 2006, although Plaintiff disputes that she ever worked with Kohn or ever communicated with him. (DSUMF ¶ 2; PRSUMF ¶ 2). The proposed policy owner and beneficiary listed on the Application was the Nancy Bergman Irrevocable Trust dated 4/6/2007 (the "Trust"). The Insured was identified as the grantor of the Trust, and the trustee at the time of the Application was Nachman Bergman ("Nachman"), her grandson. (DSUMF ¶ 6, PRSUMF ¶ 6). The Trust Agreement initially provided that any assets of the Trust and proceeds of the Policy would first be paid to Nachman. (DSUMF ¶ 10; PRSUMF ¶ 10).

Mrs. Bergman was a retired middle school teacher, with an estate allegedly valued at only between $100,000 and $250,000. (Plaintiff's Statement of Undisputed Material Facts

("PSUMF") ¶ 1; Defendant's Response to PSUMF ("DRSUMF") ¶ 1). Her only major asset was a condominium with an indicated value of $170,000 at the time of her death, although Defendant asserts that it may have been worth as much as $ 285,000. (PSUMF ¶ 2; DRSUMF ¶ 2). Mrs. Bergman's son, Sym Bergman, who was executor of her estate, said that Mrs. Bergman was never wealthy, her only income consisted of about $3,000 a month in Social Security and a pension from the New York Teacher's Association since at least 2005, and her assets did not exceed $1 million. (PSUMF ¶¶ 3, 4; DRSUMF ¶¶ 3, 4).

On or about May 16, 2007, Sun Life received an inspection report from an outside vendor, First Financial Underwriting Services, claiming that it interviewed Mrs. Bergman and her alleged accountant, Jacob Oberlander. (PSUMF ¶ 39; DRSUMF ¶ 39). The report stated that Mrs. Bergman had $9,235,000 in assets and net worth; assets that included a personal residence worth $1.1 million, a business interest worth $2 million, stocks and bonds worth $185,000, real estate rentals worth $5,250,000, savings of $500,000, and personal effects worth $200,000; and annual income "in excess of $600,000." (PSUMF ¶ 40; DRSUMF ¶ 40).

Sun Life issued the life insurance policy for $5 million on July 13, 2007, and the Trust was the sole owner and beneficiary at the time of issue. (DSUMF ¶¶ 13, 14; PRSUMF ¶¶ 13, 14). The Application was signed by Mrs. Bergman as the Insured, by Nachman as the trustee, and by Mr. Kohn as the producer. (PSUMF ¶ 25; DRSUMF ¶ 25). The general agent for the Policy was Innovative Brokers Corp. ("Innovative"). (DSUMF ¶ 17; PRSUMF ¶ 17). In the Application, it was represented that the payor of the premium was the Trust. (PSUMF ¶ 26; DRSUMF ¶ 26). Upon receipt of the initial $308,800 premium on July 13, 2007, and upon receipt of a Policy delivery receipt, the Policy was placed in force with an effective date of April 9, 2007. (PSUMF ¶¶ 58, 56; DRSUMF ¶¶ 58, 56).

The Policy has an Incontestability clause stating: "After this Policy has been in force during the lifetime of the Insured for a period of two years from the Issue Date (or the Policy Date, if earlier), we cannot contest it except for non-payment of Premiums." (DSUMF ¶ 15; PRSUMF ¶ 15). The Policy also states, "[t]he Policy Proceeds will be paid in a lump sum within 60 days of receipt of Due Proof of the Insured's death." (DSUMF ¶ 15; PRSUMF ¶ 15).

After Bergman's death, Sun Life conducted an investigation of the Trust.  Sun Life asserts that much of the information provided in connection with the Application was false. An accountant named Jacob Oberlander does exist, but he has no recollection of having Mrs. Bergman as a client, and said he would have remembered a client of such wealth. (PSUMF ¶ 42; DRSUMF ¶ 42). Plaintiff also avers that a group of investors with no relationship to Mrs. Bergman paid all of the premiums, although this is disputed by Defendant (PSUMF ¶¶ 28, 30; DRSUMF ¶¶ 28, 30). Although Mrs. Bergman said that she had no other life insurance policies, five life insurance policies in the total amount of $37 million were taken out on her life in 2007 from various insurance companies, including Sun Life. (PSUMF ¶ 5; DRSUMF ¶ 5).

Plaintiff asserts that this was all part of a STOLI scheme, and stranger investors essentially funded and profited from the scheme. These investors were David Sasson, Jacob Rosenberg, Joel Waldman, and Isaac Markowitz (the "Investors"). (PSUMF ¶ 72).[2] Kohn, the agent or insurance producer, came into contact with Waldman, and the other Investors would subsequently join in. (PSUMF ¶¶ 73, 75, 76; DRSUMF ¶¶ 73, 75, 76). On April 6, 2007, the Trust was set up with a Lakewood, New Jersey address and situs, through a Trust Agreement

---

[2] Defendant disputes the characterization of Rosenberg, Waldman, Markowitz and Sasson as "investors" in the Policy because Rosenberg and Waldman testified that they thought they were investing in an existing policy, and not one that would have to be applied for; also, some of the investors testified that they initially believed that premium payments had already been paid for the Policy. (DRSUMF ¶¶ 71-72). However, this evidence does not call into question their status as investors. Each individual stated that their intention was to profit from their investment. See, e.g., Ex. 16 to Wixted Decl., ECF No. 39-4, at 31:18-32:8.

executed by Mrs. Bergman as the purported grantor and by Nachman as Trustee. (PSUMF ¶ 17; DRSUMF ¶ 17). Plaintiff asserts that the premium payments made by the Trust were funded by the Investors, who would deposit money into the Trust account. (PSUMF ¶¶ 84, 89). The plan purportedly was to invest in this Policy with the intention of either collecting the death benefit or selling it on the secondary market after two years. (PSUMF ¶ 74).

On August 21, 2007, in Lakewood, New Jersey, Nachman executed a document called "Renunciation and Appointment of Successor Trustees." (PSUMF ¶ 91; DRSUMF ¶ 91). This document allowed Nachman to resign as Trustee and designate and appoint Rosenberg, Waldman, Markowitz and Ariel Sasson (David Sasson's brother) as successor co-trustees. (PSUMF ¶ 92; DRSUMF ¶ 92). An amendment to the Trust was executed by Mrs. Bergman and Nachman acknowledging that Nachman had resigned as trustee and the Investors had been appointed. (PSUMF ¶¶ 100, 101). [3] Trust provisions were also changed to provide that, generally, if the Policy were sold, Nachman would receive 10% of the sum of the principal and undistributed income of the Trust, less amounts paid as premiums, and that the balance of the funds would be distributed 50% to Sasson and 50% to Rosenberg. If Mrs. Bergman were to die while the Trust still owned the Policy, Nachman, generally, would receive 5% of the death benefit, and the balance would be distributed 50% to Sasson and 50% to Rosenberg. (PSUMF ¶ 103). The Amendment also allowed the successor trustees to sell the Policy without consent or notice to Mrs. Bergman or Nachman. (PSUMF ¶ 104).

In December 2009, just after the expiration of the two-year contestability period, the Trust sold the Policy to SLG Life Settlements, LLC for $700,000. (PSUMF ¶ 105; DRSUMF ¶

---

[3] Defendant contends that the Trust Amendment is a nullity since it was not executed in accordance with New York law. See N.Y. Est. Powers & Trusts §7-1.9; N.Y. Gen. Oblig. §5-703; N.Y. Real Prop. §§ 243, 291, 292, 309-a, 309-b. (DRSUMF ¶ 103). But whether the amendment is a nullity or not is irrelevant, since the funds were eventually distributed in accordance with the amendment.

105). The Trust would distribute $699,250 to the Investors. (PSUMF ¶ 108; DRSUMF ¶ 108).

Plaintiff claims that neither Mrs. Bergman nor Nachman received any portion of these proceeds,

although Defendant notes that it is not clear from the evidence that they received nothing.

(PSUMF ¶ 110; DRSUMF ¶ 110). But Defendant agrees that the $700,000 went to the Trust, the

Trust distributed $699,250 to the Investors, and that a $750 difference was used for bank fees

and to pay a small amount to an unknown recipient. (DRSUMF ¶¶ 107-109).

Wells Fargo, as a "securities intermediary," would eventually acquire the Policy as part

of a portfolio of 410 policies pursuant to a March 16, 2010 Settlement and Sales Agreement.

(PSUMF ¶¶ 117-18; DRSUMF ¶¶ 117-18)[4].

In a February 5, 2010 Reservation of Rights Letter ("ROR Letter"), Sun Life confirmed

that the owner and beneficiary of record for the Policy had been changed from the Trust to Wells

Fargo. (DSUMF ¶ 21). This letter stated:

> Sun Life Assurance Company of Canada wishes to advise you,
> however, that it reserves all rights under the Policy, and all rights to
> challenge the validity of the Policy, on any grounds, including but
> not limited to misrepresentation, lack of compliance with the
> applicable insurance laws, and/or a lack of insurable interest.

(DSUMF ¶ 22; PRSUMF ¶ 22).

In a deposition, a Sun Life representative noted that a transfer of a policy pursuant to a

life settlement transaction is a "red flag." (DSUMF ¶ 23; PRSUMF ¶ 23). However, Plaintiff

asserts that Sun Life did not review or investigate the validity of the Policy after sending this

February 5, ROR Letter. Sun Life disputes that there was no investigation. (DSUMF ¶ 23;

PRSUMF ¶ 23).

---

[4]        See footnote 1.

Following the transfer of the policy to Wells Fargo, Sun Life accepted and retained ongoing premium payments from Wells Fargo from March 5, 2010 to June 19, 2014. (DSUMF ¶ 24; PRSUMF ¶ 24). The total sum of all funds paid by Wells Fargo ranges between $800,000 and $1,928,726.01.  (DSUMF ¶¶ 25, 26; PRSUMF ¶¶ 25, 26).  Wells Fargo alleges it is owed direct premium payments that it made, plus the loan proceeds to LTAP that were used to pay said premiums which total $1,928.726.01.

Also, following the transfer to Wells Fargo and the February 5, 2010 ROR letter, Sun Life provided many "In Force" illustrations and other information about the Policy to Wells Fargo or to Wells Fargo's authorized third-party agent, MLF Lexserv ("Lexserv"). (DSUMF ¶ 27; PRSUMF ¶ 27).  Between February 8, 2010 and April 8, 2014, Sun Life provided Defendant or Lexserv with six "In Force" illustrations for the Policy. (DSUMF ¶ 28; PRSUMF ¶ 28). On April 27, 2011, Sun Life provided Defendant with a "Summary of Policy Information" for the Policy. (DSUMF ¶ 28; PRSUMF ¶ 28). Sun Life also provided Defendant or Lexserv with Annual Reports for the Policy in 2012, 2013, and 2014. (DSUMF ¶ 29; PRSUMF ¶ 29).

Mrs. Bergman passed away on April 6, 2014 at the age of 89. (PSUMF ¶ 121; DRSUMF ¶ 121). On August 18, 2014, Lexserv, on behalf of Wells Fargo, submitted to Sun Life a claim for payment of the Policy's death benefit. (DSUMF ¶ 30; PRSUMF ¶ 30).

This action was commenced by Sun Life on September 17, 2014, seeking a declaration that the Policy was void *ab initio*. (ECF No. 1). Wells Fargo answered the Complaint on December 22, 2014 and asserted a counterclaim for breach of contract. (ECF No. 8).

Finally, Wells Fargo has filed a motion to strike evidence from consideration. (ECF No. 51). Sun Life had learned during discovery that one of the five policies taken out in a five-month span in 2007, the Transamerica Policy, was the subject of another litigation in the U.S. District

Court for the District of South Dakota. The facts are very similar, with Nachman as trustee. In that litigation, Mrs. Bergman's Estate and Nachman are alleging that the Transamerica Policy was a STOLI policy whereby Mrs. Bergman was recruited to participate in the scheme. A summary judgment opinion was recently filed in the *Transamerica* action on April 14, 2016. *See SPV-LS, LLC v. Transamerica Life Ins. Co.*, 2016 WL 1466529 (D.S.D. April 14, 2016).

**Legal Standard:**

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.,* 358 F.3d 241, 247 (3d Cir. 2004) (*quoting Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson, 477 U.S. at 248; Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). Moreover, only disputes over facts

that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48.

**<u>Analysis:</u>**

**I.  Motion to Strike**

The first issue is whether to strike certain portions of Plaintiff's motion for summary judgment involving the documents filed in the South Dakota *Transamerica* case. Neither Plaintiff nor Defendant is a party to such action, nor has either filed papers there. The connection is that the life insurance was for the same person insured here, with the same alleged scheme; Transamerica, the insurer in the South Dakota action, interpleaded Nachman, among other parties, in that case. Wells Fargo argues that the facts of that case are inadmissible hearsay and may not be judicially noticed. Defendant seeks to strike paragraphs 130-140 and 142-145 of the PSUMF (ECF No. 38-4), Exhibits 49-53 and portions of Exhibit 55 of the Declaration of Nicole C. Wixted in support of Sun Life's Motion for Summary Judgment (ECF No. 39), as well as Section II.F of Sun Life's Memorandum of Law in Support of Summary Judgment (ECF No. 43-1). This issue is moot because the Court will not base its decisions on factual information from the *Transamerica* matter (see page 12-14).

**II.  Choice of Law**

The Court must decide whether to apply New York or New Jersey law regarding a challenge to the incontestability of the Policy. New Jersey's choice of law rules govern because it is the forum. *See Warriner v. Stanton*, 475 F.3d 497, 499 (3d Cir. 2007) (stating that, "[i]t is well established that in a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case."). Under New Jersey's choice of law analysis, courts first analyze whether there is an actual conflict between

9

the laws of the two forums. *See Lonza, Inc. v. The Hartford Acc. and Indem. Co.*, 359 N.J. Super. 333, 342 (App. Div. 2003). "Any such conflict is to be determined on an issue-by-issue basis." *Lonza*, 359 N.J. Super. at 342 (quoting *Veazey v. Doremus*, 103 N.J. 244, 248 (1986)). Second, if there is an actual conflict, courts must "determine the interest that each state has in resolving the specific issue in dispute." *Id*. at 345 (quoting *Gantes v. Kason Corp.*, 145 N.J. 478, 485 (1996)).

Wells Fargo argues that there is no actual conflict here because the statutes are essentially identical in New York and New Jersey. In fact, in the recently decided *Transamerica* Action, the District Court of South Dakota held that there was no conflict between the laws of New York and New Jersey on the issue of whether STOLI arrangements are prohibited. *See Transamerica*, 2016 WL 1466529, at *6. As the *Transamerica* Court noted, the applicable statutory provisions are almost the same. *Compare* N.Y. Ins. Law § 3205(b)(2) ("No person shall procure or cause to be procured, directly or by assignment or otherwise any contract of insurance upon the person of another unless the benefits under such contract are payable to the person Insured or his personal representatives, or to a person having, at the time when such contract is made, an insurable interest in the person Insured") with N.J.S.A. § 17B:24-1.1(b) ("No person shall procure or cause to be procured any insurance contract upon the life, health or bodily safety of another individual unless the benefits under that contract are payable to the individual Insured or his personal representative, or to a person having, at the time when that contract was made, an insurable interest in the individual Insured").

In New York, an insurer cannot challenge the validity of a policy on insurable interest grounds more than two years after the Policy was issued based on the incontestability provision. *See New England Mut. Life Ins. Co. v. Caruso*, 73 N.Y.2d 74 (1989). *Caruso* also established that the insurable interest statute does "not make life insurance contracts void if the Policyholder

lacks an insurable interest in the Insured's life." *Caruso*, 73 N.Y.2d at 79. This principle was

bolstered in *Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539 (2010), where the New York Court

of Appeals determined that an individual could procure a life insurance policy on his own life

through a trust and immediately assign that policy to a person without an insurable interest in the

insured's life, even if the insured intended to assign that policy at the time of procurement. *See

Kramer*, 15 N.Y.3d at 545.[5]

However, in New Jersey, neither the Third Circuit nor state courts have addressed

whether the immediate transfer of a life insurance policy to an individual without an insurable

interest would void a policy under New Jersey law. *See Am. Nat. Ins. Co. v. Conestoga

Settlement Trust*, 442 S.W.3d 589, 594 (Tex. Ct. App. 2014); *see also Lincoln Nat. Life Ins. Co.

v. Calhoun*, 596 F. Supp. 2d 882, 890 (D.N.J. 2009).

Two New Jersey District Courts have considered this issue: *Lincoln Nat'l Life Ins. Co. v.

Calhoun*, 596 F. Supp. 2d 882, 889 (D.N.J. 2009) and *Lincoln Nat'l Life Ins. Co. v. Schwarz*,

2010 WL 3283550 (D.N.J. 2010). These courts attempted to predict how the Third Circuit or

New Jersey Supreme Court would rule, and noted that the New Jersey Constitution prohibits

unauthorized "gambling of any kind." N.J. Const. art. IV, § VII, ¶ 2. New Jersey law provides

that "[g]aming transactions," including "wagers…upon any lot, chance, casualty or unknown or

contingent event" are "unlawful." N.J. Stat. Ann. § 2A:40-1; see also § 2A:40-3 (declaring

gaming transactions in violation of N.J. Stat. Ann. § 2A:40-1 to be "utterly void and of no

effect"). Furthermore, in New Jersey, an individual has an insurable interest in those "to whom

---

[5] It should be noted that the New York Legislature added a provision effective May 18, 2010 prohibiting "stranger originated insurance" transactions. Since the provision is effective as of 2010 and not retroactive, it would not apply to this dispute, which involves a Policy issued in 2007. *See* N.Y. Ins. Law § 7815; *Kramer*, 15 N.Y.3d at 549, n.5.

he is closely related by blood or by law and in whom he has a substantial interest engendered by love and affection." N.J. Stat. Ann. § 17B:24-1.1a(2).

Such law stems from the Supreme Court's decision in *Grigsby v. Russell*, 222 U.S. 149 (1911), which explained that an insurable interest is necessary because "[a] contract of insurance upon a life in which the [policy owner] has no interest is a pure wager that gives the [policy owner] a sinister counter interest in having the life come to an end." *Id*. at 154-55.  Similarly, in *Calhoun*, Judge Pisano explained that, "[l]ife insurance was typically understood as a means of providing for dependents after the Insured has passed on." 596 F. Supp. 2d at 885. "Insureds begin to run afoul of the insurable interest requirement, however, when they intend at the time of the Policy's issuance, to profit by transferring the Policy to a stranger with no insurable interest at the expiration of the contestability period." *Id.* at 889. In *Schwarz*, Judge Wolfson further stated that, "[w]hile New Jersey state courts have not addressed this specific issue," there was "support for [the insurer's] position that these types of 'wager' arrangements should not be enforced in New Jersey because of the state courts' strong distaste for contracts that are contrary to public policy." 2010 WL 3283550, at * 7. According to *Schwarz*, "the New Jersey Supreme Court would likely follow decisions from other state and federal courts" and the "New Jersey Supreme Court would likely hold that the STOLI arrangement, as alleged by [the insurer], would be akin to a wagering contract, and therefore, void *ab initio*." *Id*. at *8.

The *Transamerica* Court concluded that there was no conflict between New Jersey and New York law because the statutory provisions in both state laws are essentially the same. *Id*. at *4. Indeed, *Schwartz*, decided before the *Kramer* case in New York, considered New York and New Jersey law to be the same. *Id*. at *4-5. Also, *Transamerica* subscribed to the *Kramer* Court's notion that there is nothing in either statute that specifically prohibits an insured from

intending at the time of the issuance of the Policy to transfer the Policy to someone without an insurable interest. 2016 WL 1466529 at *7. Essentially, *Transamerica* held that New York and New Jersey law were identical on this issue, but *Kramer*, and not *Calhoun* and *Schwarz*, came to the appropriate conclusion on the law, and that *Calhoun* and *Schwarz* may have come to different conclusions if they occurred after *Kramer*. 2016 WL 1466529 at *4.

This Court respectfully disagrees with the conclusion of *Transamerica*. First, the New York and New Jersey insurable interest statutes, while similar, are not identical. In fact, the New York statute contains an important provision that is absent from the New Jersey statute. The New York statute states:

> (b)(1) Any person of lawful age may on his own initiative procure or effect a contract of insurance upon his own person for the benefit of any person, firm, association or corporation. Nothing herein shall be deemed to prohibit the immediate transfer or assignment of a contract so procured or effectuated.

N.Y. Ins. Law § 3205. This provision, which factored significantly into the decision of the New York Court of Appeals in *Kramer*, does not exist in the New Jersey statute. According to the majority in *Kramer*: "[t]he statutory text contains no intent requirement; it does not attempt to prescribe the Insured's motivations. To the contrary, it explicitly allows for 'immediate transfer or assignment'…This phrase evidently anticipates that an Insured might obtain a policy with the intent of assigning it, since one who 'immediately' assigns a policy likely intends to assign it at the time of procurement." 15 N.Y.3d at 552.

In addition, the case law now diverges in New York and New Jersey. While *Calhoun* and *Schwarz* did predate *Kramer*, they did not predate *Caruso*, and the *Caruso* Court found that "nothing in the statutory scheme makes void *ab initio* policies acquired by one lacking an insurable interest..." 73 N.Y.2d at 80-81. Therefore, it is not clear that *Calhoun* and *Schwarz*—

which explained that the New Jersey Supreme Court would likely hold that STOLI contracts violate public policy, thereby making a policy void *ab initio*—would have come out differently had they occurred after *Kramer*. *Calhoun* and *Schwarz* also adhere to the majority view. *See Schwarz*, 2010 WL 3283550 at *8 (explaining that "a survey of precedent from other state and federal courts demonstrates that the majority view is that life insurance contracts that lack a person with an insurable interest at inception are akin to wagering contracts, and therefore void *ab initio*); *see also PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, ex. rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1068 (Del. 2011) (rejecting "the contrary result reached in *New England Mut. Life Ins. Co. v. Caruso*, because in that case the New York court, unlike Delaware and most other jurisdictions, held that a policy lacking an insurable interest was not void at the outset."). This Court finds that there is a conflict between New York and New Jersey law.

*

If an actual conflict exists, New Jersey applies the "most significant relationship" test by "weigh[ing] the factors set forth in the Restatement section corresponding to the plaintiff's cause of action." *Snyder v. Farnam Cos., Inc.,* 792 F. Supp. 2d 712, 717 (D.N.J. 2011) (internal citations omitted). However, the parties disagree about which provision to consider in the Restatement (Second) of Conflict of Laws. Wells Fargo implores the Court to follow section 192, which states:

> The validity of a life insurance contract issued to the Insured upon his application and the rights created thereby are determined, in the absence of an effective choice of law by the Insured in his application, by the law of the state where the Insured was domiciled at the time the Policy was applied for, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the transaction and the parties, in which event the local law of the other state will be applied.

14

Restatement (Second) of Conflict of Laws § 192 (1971). Mrs. Bergman, the Insured, resided in New York. (DSUMF ¶ 3; PRSUMF ¶ 3). However, Sun Life argues that this is not the appropriate provision because section 192 only applies to a policy "issued to the insured upon his application," and it "does not apply to life insurance issued upon the life of someone other than the applicant." Restatement (Second) Conflict of Laws § 192 cmt. a. Here, the Trust, located in New Jersey, was the applicant, not Mrs. Bergman. The Court acknowledges that it is unclear whether section 192 is applicable to the situation here. Section 192, comment (a) states that where the life insurance is issued on the life of someone other than the applicant, "no more definite rule can be stated…than that stated in § 188." *Id*. While Mrs. Bergman was the Insured, she appears to have been a means by which the Policy was conveyed to the Trust for the benefit of investors. The Court will apply section 188. This section provides:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>> (a) the place of contracting,
>> (b) the place of negotiation of the contract,
>> (c) the place of performance,
>> (d) the location of the subject matter of the contract, and
>> (e) the domicil, residence, nationality, place of
>>    incorporation and place of business of the parties.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.
>
> (3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189- 199 and 203.

Restatement (Second) of Conflict of Laws § 188. Section 188 calls for application of the "most significant relationship" test of section 6. The principles of section 6 are:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of Laws § 6(2).

There are several connections to New York. The Insured resided in New York. (DSUMF ¶ 3; PRSUMF ¶ 3). Defendant claims that the financial information in the Inspection Report was based on interviews conducted in New York and from sources in New York, though Plaintiff explains that the Inspection Report is clearly unreliable based upon fabricated information. (DSUMF ¶ 12; PRSUMF ¶ 12). The principal office of Innovative is Brooklyn, New York. (DSUMF ¶ 17; PRSUMF ¶ 17). The Policy and its delivery requirements were sent by Sun Life to Innovative at its Brooklyn office, and the materials were then delivered by Innovative to Kohn in New York. (DSUMF ¶ 19). Innovative's New York employees obtained the Insured's medical records in New York at Sun Life's request and sent them to Sun Life. (PSUMF ¶ 20; DRSUMF ¶ 19).

New Jersey also has significant ties to this matter. The Trust Agreement had an address for the Trust in Lakewood, New Jersey. (PSUMF ¶ 24; DRSUMF ¶ 24). It stated that Nachman had an address in Lakewood, New Jersey, but according to Defendant, he was at the relevant times prior to 2009 a resident of, and domiciled in New York. (DSUMF ¶¶ 8, 9). Plaintiff disputes this, saying that Nachman said he was working and staying with a friend in New Jersey in 2006 and 2007. (PRSUMF ¶¶ 8, 9). Kohn was appointed by Sun Life in New Jersey, but

Kohn's resident agent's license was in New York and his non-resident agent license was in New Jersey. (DSUMF ¶ 18).

The Life Insurance Policy Dating Acknowledgment, and Delivery Receipt Form represents that it was signed by Nachman and Kohn on August 7, 2007 in Lakewood, New Jersey. (PSUMF ¶ 61; DRSUMF ¶ 61). The Trust Agreement provides that the address for the Trustee is Lakewood, New Jersey, and the Trust Agreement provides that the situs of the Trust is Lakewood, New Jersey. Defendant notes that the situs of the Trust was changed to Baltimore, Maryland in 2009. (PSUMF ¶¶ 20, 21; DRSUMF ¶¶ 20, 21). Several documents submitted to Sun Life in connection with the underwriting of the Policy represented that they had been signed in Lakewood, New Jersey, including the Certificate of Insurability, the Request for Alteration of the Application, Authorization for Release and Disclosure of Non-Health Related Information, Authorization for Release and Disclosure of Psychotherapy Notes and the Non-Licensed Territory Declaration. (PSUMF ¶ 34). Defendant appears to dispute this fact by claiming that the documents are unclear as to who signed the documents on the date and times listed. (DRSUMF ¶ 34). However, the documents speak for themselves, containing signatures of Nachman, Kohn, and the Insured, with dates and locations. Defendant has provided no evidence explaining why the Court should conclude otherwise. *See Mimi Ma. v. Westinghouse Elec. Co., LLC*, 559 F. App'x 165, 171 (3d Cir. 2014) ("summary judgment can be avoided only by proffering evidence sufficient to create a material dispute of fact").

In addition, the trustee, the Insured, and Kohn executed the Non-Licensed Territory Declaration representing that no solicitation for the sale of the Policy occurred in New York (PSUMF ¶¶ 52, 53). Defendant contends that there were a number of communications that occurred in New York despite this declaration. The communications cited by Wells Fargo are

17

exchanges between Sun Life and Innovative about providing certain documents for the Policy to go into effect. It is not clear whether this involves actual "solicitation" of the Policy, as opposed to mere administrative details, and none of these communications directly involve the trustee, the Insured, or Kohn, who were the signatories to the Declaration. (DRSUMF ¶¶ 52, 53). When Wells Fargo submitted the death claim to Sun Life, the claim form acknowledged that it "cannot be used for policies issued in the state of New York." (PSUMF ¶ 125; DRSUMF ¶ 125).

The "most significant relationship" test of section 6 also concerns public policy factors and justified expectations. It is difficult to decide whether New York's public policy interest in preserving the incontestability of policies after two years is more or less important than New Jersey's interest in having STOLI policies declared violative of public policy. Sun Life also argues that New Jersey has the dominant governmental interest because New Jersey enacted an Insurance Code regulating life insurance policies that are "delivered or issued for delivery" in New Jersey. See N.J. Stat. Ann. §§17B:17-20. New York's Insurance Code concerns life insurance policies that are "delivered or issued for delivery" in New York. N.Y. Ins. Law §§ 3103, 3203(a)(3). Wells Fargo argues that this case also involves the illegal practice of insurance by Sun Life in New York, because Sun Life is not licensed to sell insurance contracts in New York, and its agent, Innovative, essentially negotiated the deal in New York.

When considering all of these factors, the Court finds that New Jersey law should apply. The most important factor supporting Wells Fargo is that Mrs. Bergman was domiciled in New York. The most important factors supporting Sun Life are that the Trust was located in New Jersey and the place of contracting was New Jersey. There are disputes about where the majority of the negotiation of the Policy occurred. Mrs. Bergman's domicile is not as important here as it would be in a typical insurance dispute, because she was merely a vessel to further an investment

scheme. Also, as Plaintiff indicates, while Nachman may have resided in New York, he was not

a contracting party—he was the trustee of the New Jersey-based Trust, and the Trust was one of

the contracting parties. Sun Life and the Trust are the two parties to the contract, and both are in

New Jersey. Furthermore, where the underwriting of the Policy occurred or where interviews

related to the Inspection Report occurred are not necessarily relevant under the Restatement. Sun

Life also argues that any reliance on the Inspection Report is meaningless because the financials

in that report were fake (for example, Mrs. Bergman's alleged accountant, Jacob Oberlander,

was apparently never her accountant). The governmental factors do not persuade the Court in

one direction over the other. However, it seems as though the parties would be justified in

expecting New Jersey law to apply because it seems as though most of the connections, and the

qualitatively most significant connections, relate to New Jersey. When analyzing all of these

factors, the Court concludes that New Jersey has the most significant relationship to this dispute,

and its law will apply.

### III.  Whether the Policy is a STOLI transaction and void *ab initio*

Sun Life argues that this case involves an illegal wagering contract under New Jersey law

because the Policy was funded by investors who lacked an insurable interest in Mrs. Bergman's

life, in order to wager on her life.

In a "typical STOLI transaction," the candidate "acts as a 'nominal grantor' of a life

insurance trust that is used to apply for the Policy." *Calhoun*, 596 F. Supp. 2d at 885. There is no

insurable interest if a Policy is procured as a cover for the wager. *See PHL Variable Ins. Co. v.

Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1075 (Del. 2011). When analyzing whether such a

procurement is a cover, courts should "scrutinize the circumstances under which the Policy was

issued and determine who in fact procured or affected the Policy." *Id*. at 1076. The court should

not permit an "illogical triumph of form over substance that would completely undermine the Policy goals behind the insurable interest requirement." *Id*. at 1071. *Price Dawe* noted one telltale sign of such a scheme: "[I]f a third party funds the premium payments by providing the insured the financial means to purchase the Policy then the insured does not procure or affect the Policy." *Id*. at 1076.

It seems clear that the investors funded the premiums with the intent to sell the Policy on the secondary market or collect the benefit. Five insurance policies with a total face amount of $37 million with annual premiums totaling $2,179,545, produced by Kohn, were taken out on the life of Mrs. Bergman. Although there is a factual dispute about how wealthy Mrs. Bergman actually was, it seems clear that she did not have the means for the policies that were taken out. (PSUMF ¶¶ 5, 146; DRSUMF ¶¶ 5, 146). Investors Waldman, Markowitz, Rosenberg and David Sasson all claimed that they did not know or speak with Mrs. Bergman or her grandson. (PSUMF ¶ 71; DRSUMF ¶ 71). The Investors also said that the plan from the beginning was to either collect the death benefit upon Mrs. Bergman's death or to sell it after the two-year incontestability period. (PSUMF ¶¶ 72, 74; DRSUMF ¶¶ 72, 74). These investors deposited money into the Trust's bank account to pay the premium. (PSUMF ¶ 86). According to Sun Life, there is no evidence that Mrs. Bergman or Nachman personally funded any of the premiums. Right after the Policy was issued, Nachman resigned as trustee of the Trust and Investors were named successor trustees. (PSUMF ¶ 92); the Trust Agreement was then amended to give Investors either 95 percent of the death benefit upon her death, or 90 percent of the profits from any sale. Also, when the Policy was sold, it does not appear that any of the proceeds went to anyone with an insurable interest in Mrs. Bergman. (PSUMF ¶ 108).

Defendant disputes the assertion that the Investors paid all of the premiums. Wells Fargo recites the deposition testimony of Rosenberg and Waldman explaining that they thought they were investing in an existing policy and not one that would have to be applied for and procured. Rosenberg also testified that, upon first hearing about the Policy, he believed that premium payments had already been paid. Waldman also testified that he first thought that premium payments had already been paid, and that he could not remember whether there was an understanding that any of the monies paid by him and/or the four Investors would act to reimburse the trust for premium payments it had already made. He also testified that he did not know whether all premium payments on the Policy had been paid by "investors." Markowitz testified that he did not know whether the money that the Trust used to pay the initial $308,800 premium came from funds deposited by "investors." In addition, Defendant says that there is no evidence that any of the four individuals paid premiums in connection with the Policy before 2008, over a year after the Policy was issued and after the initial premiums had been paid by the Trust. Similarly, Nachman testified that he thought an initial premium payment of $408,800 was paid for by his grandmother, Mrs. Bergman.  (DRSMF ¶ 84).

In response, Plaintiff claims that Rosenberg and Waldman did not testify that they believed premium payments had already been made. In another part of the deposition, Rosenberg explained, "If the question is specifically [whether the premium payments had already been made]—no, I did not know." Similarly, Waldman testified that he was not sure whether any premium payment had been made. Nachman admitted that he did not review any of the bank statements, and his knowledge simply came from Mrs. Bergman. (Plaintiff's Reply in Support of Sun Life's Statement of Undisputed Material Facts ("RSUMF") ¶ 85). Plaintiff also states that the Investors testified that their purpose was to make a profit. Also, the Amended Trust

Agreement provided that any sales proceeds would be distributed to reimburse premiums, and excees proceeds would be distributed 90% to Investors and 10% to Nachman. The Policy was ultimately sold for $700,000, even though the total premiums paid equaled $712,801.50. The Trust would distribute $699,250 to the Investors. That $750 difference was used, in part, for bank fees and a small payment to an unknown recipient. The funds were distributed to the Investors, and no funds went to any other party. Rosenberg testified that he understood that only people that invested in the Policy, meaning those who deposited money into the trust account to pay a premium, received money after the Policy was sold. Waldman testified that it was his understanding that all premiums paid in connection with this Policy were paid by Investors, and no part of the $700,000 would have been distributed to anyone who did not invest in the Policy. Plaintiff also explains that, according to the available bank records for the Trust account, all premiums paid from the account from June 12, 2009 through December 23, 2009 (totaling $234,001.50) were funded by Investors immediately before payment was made. (PRSUMF ¶ 84).

The evidence offered by Wells Fargo is not sufficient to defeat summary judgment. Most of the testimony from the Investors is inconclusive. While the evidence clearly supports the fact that they provided funding for the Policy, the testimony does not indicate that anyone else funded the premiums. The Investors essentially claimed that they did not know whether anyone else funded the premiums. Even though Nachman at first testified that he assumed his grandmother had made the initial payment for the premiums when the Policy was taken out, he explained that after Mrs. Bergman died, his family came to the realization that she was not a particularly wealthy person. Moreover, the evidence indicates that the Investors received the proceeds from the sale of the Policy. For all of these reasons, the Court is satisfied that this was a STOLI

transaction lacking insurable interest in violation of public policy under New Jersey law. As

such, it should be declared void *ab initio*. *See Schwarz*, at \*24-25 (stating that the "New Jersey

Supreme Court would likely hold that the STOLI arrangement, as alleged by [the insurer] would

be akin to a wagering contract, and therefore, void *ab initio*.").

## IV.   Waiver and Estoppel

Wells Fargo also argues that Sun Life is prohibited from challenging the validity of the

Policy due to waiver and estoppel. New Jersey courts have considered waiver where the insurer

"engaged in some other course of conduct that clearly manifested an intent on the part of the

insurer to continue coverage." *Barna v. McCarthy*, 2007 WL 3354292, at \*2 (N.J. Super. Ct.

App. Div. 2007).

Sun Life sent its February 5, 2010 ROR letter, but then, according to Defendant, did

nothing to investigate. Sun Life's corporate representative testified that the transfer of Policy

ownership to Defendant regarding a life settlement transaction was a "red flag." (DSUMF ¶ 23).

However, Sun Life just continued to accept and retain premium payments over the next four and

a half years. (DSUMF ¶¶ 24-26). Also, after the letter, Plaintiff sent six "In Force" Policy

illustrations and one "Summary of Policy Information" to Defendant, and sent Defendant reports

for the Policy in 2012, 2013, and 2014. Plaintiff also confirmed the premium history of the

Policy for Lexserv on three different occasions between June and August of 2012. (DSUMF ¶¶

24-29). Defendant argues that Sun Life did not conduct "reasonable diligence" here.

Sun Life responds that this is irrelevant because the Policy is void. "A void contract is a

contract that is of no legal effect, so that there is really no contract in existence at all. A contract

may be void because it is technically defective, contrary to public policy, or illegal." *D'Agostino

v. Maldonado*, 216 N.J. 168, 194, n. 4 (2013) (internal quotations omitted). "The term 'void *ab*

*initio*' means '[a] contract is null from the beginning if it seriously offends law or public policy, in contrast to a contract which is merely voidable at the election of one of the parties to the contract.' " *Bunky, Inc. v. Hammel*, 2005 WL 3772487, at *7 (N.J. App. Div. Feb. 17, 2006). Courts in this District have stated that, "[t]he doctrine of estoppel cannot be invoked to enforce an agreement in violation of public policy." *Coldwell Banker Commercial Real Estate Servs. v. Wilson*, 700 F. Supp. 1340, 1347 (D.N.J. 1988).

The Court agrees with Sun Life. The Policy here is a violation of public policy and void *ab initio*. As such, there is no contract at all, and waiver and estoppel do not apply.

## V.   Refund of Premiums

Wells Fargo also seeks a refund of its premiums. Plaintiff contends that courts will not restore parties to their status quo when the contract is illegal. According to Plaintiffs, this contract is void, making it "of no legal effect, so that there is really no contract in existence at all." *Mercedes-Benz USA LLC v. Coast Auto Group, Ltd*. (D.N.J. Sept. 29, 2006). Also, Plaintiff explains that New Jersey does not permit parties to recoup funds exchanged as part of a wagering transaction. See N.J. Stat. Ann. §2A:40-3; *Nemtin v. Zarin*, 577 F. Supp. 1135, 1147 (D.N.J. 1983). According to Plaintiff, granting Defendant's request "would have the perverse effect of reducing the defrauders' risk relative to honest policyholders; any defrauder could commit to paying premiums on his fraudulently procured policy knowing that if the premiums ever became unaffordable, he could declare his fraud and receive all of the previously paid premiums back." *Wuliger v. Mfgs. Life Ins. Co*., 567 F.3d 787, 797-98 (6th Cir. 2009).

However, such caution is misplaced here because the defrauders would not be obtaining a refund; Wells Fargo, which did not commit any fraud, would be refunded. Judge Posner came to the same conclusion in *Ohio National Life Assurance Corp. v. Davis*, 803 F.3d 904 (7th Cir.

2015). Some of the defendants in that case were to blame for the fraudulent, and subsequently voided policy; and the Seventh Circuit found that they were not entitled to recoup their premiums because that would only "increase the likelihood of unlawful activity." *Davis*, 803 F.3d at 911. However, one of the other defendants had not participated in the conspiracy, but had purchased a beneficial interest in the policies and had paid premiums. "Since the Policy was void from the outset through no fault of his, the premiums were not an offset against the proceeds to the Policy's beneficiary, because there would be no proceeds," according to Judge Posner. "Retention of the premiums would thus have been a windfall for Ohio National [the insurer] to which it had no entitlement." *Id*.

The court in *Sun Life Assur. Co. of Canada v. U.S. Bank National Association*, 2016 WL 161598 (S.D. F. Feb. 29, 2016) came to a similar conclusion, while applying Delaware law, opting to return the insurance premiums to the bank that purchased the Policy that was subsequently declared void *ab initio*. *Id*. at *18. That Florida District Court decision conformed with how Delaware courts have handled the issue. *See Sun Life Assur. Co. of Canada v. Berck*, 719 F. Supp. 2d 410, 418-19 (D. Del. 2010) (explaining that, [i]f an insurance company could retain premiums while also obtaining rescission of a policy, it would have the undesirable effect of incentivizing insurance companies to bring rescission suits as late as possible, as they continue to collect premiums at no actual risk.").

The reasoning from *Davis, U.S. Bank,* and *Berck* is sound: Wells Fargo is not to blame for the fraud here; it merely acquired a life insurance policy through a security interest, and that policy turned out to be void. Allowing Sun Life to retain the premiums would be a windfall to the company, especially where it failed to uncover the fraud from the Policy's inception and failed to discern any fraud until years later, after the Policy was purchased by Wells Fargo.

25

Therefore, Wells Fargo's motion to recover its premium payments is granted.  The amount, as stated earlier, is in dispute and will be determined at a hearing.

**ORDER**

IT IS, on this 30th day of September, 2016, hereby

**ORDERED** that Wells Fargo's motion to strike [ECF No. 51] is denied as moot; and is further

**ORDERED** that Wells Fargo's motion for Summary Judgment is denied [ECF No. 37]; it is further

**ORDERED** that Sun Life's motion for Summary Judgment is granted in part and denied in part [ECF No. 38]; it is further

**ORDERED** that the $5,000,000 life insurance policy issued by Sun Life on the life of Nancy Bergman is hereby declared void *ab initio* and Sun Life has no obligation to pay the death benefit; and it is further

**ORDERED** that Sun Life shall refund the premiums paid by Wells Fargo for the life insurance policy; and it is further

ORDERED that a hearing to determine the amount to be paid to Wells Fargo will commence on October 20, 2016 at 11:30 a.m.


*s/Peter G. Sheridan*
PETER G. SHERIDAN, U.S.D.J.